

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

KELLY CAPITAL, LLC and
KELLY ESCROW FUND V, LLC,

      Plaintiffs and Counterclaim
      Defendants,

v.                         Civil Action No. 3:10cv728

S&M BRANDS, INC.,

      Defendant and Counterclaim
      Plaintiff,

v.

SEI PRIVATE TRUST COMPANY,
as Trustee of the SEI Private Trust,

      Counterclaim Defendant.


## MEMORANDUM OPINION

This matter is before the Court after a bench trial on the First Amended Complaint ("FAC") (Docket No. 49) filed by Kelly Capital, LLC ("Kelly Capital") and Kelly Escrow Fund V, LLC ("Kelly Escrow")[1] against S&M Brands, Inc. ("S&M Brands"); the Amended Counterclaim ("ACC") filed by S&M against Kelly Capital,

---

[1] Kelly Capital, LLC and Kelly Escrow Fund V, LLC were the primary negotiators of the ERTA, and the two entities acted in concert throughout the transaction. Hereafter, the two will collectively be referred to as "Kelly," except where precision requires that they be separately called.

Kelly Escrow, and SEI Private Trust Company as Trustee of the SEI Private Trust ("SEI") (Docket No. 53); and the Amended Answer and Counterclaim filed by SEI against S&M (Docket No. 58).

In Count One of the FAC, Kelly seeks a declaratory judgment respecting the obligation to pay certain taxes under a contract with S&M and a declaration that Kelly has not breached that contract and is entitled to exercise certain option rights under it. In Count Two of the FAC, Kelly seeks specific performance of the contract.

In Count I of the ACC, S&M seeks a declaratory judgment respecting Kelly's and SEI's obligations to pay those same taxes under the same contract that is at issue in the FAC. In Count II of the ACC, S&M seeks a declaration that Kelly and SEI have committed an anticipatory breach of that contract by stating that they will not pay the taxes and that, because of this breach, S&M is released from certain obligations under the contract respecting the option rights.

In Count I of the Amended Counterclaim (Docket No. 53), SEI seeks the same declaration that Kelly Capital seeks in Count One of the FAC. SEI does not present a claim equivalent to Count Two of Kelly's FAC.

For the reasons that follow, judgment will be entered for S&M and against Kelly on the FAC; judgment will be entered

against Kelly and SEI on the ACC; and judgment will be entered in favor of S&M and against SEI on SEI's Amended Counterclaim.[2]

## FINDINGS OF FACT

The contract at the core of the FAC, S&M's ACC, and SEI's Amended Counterclaim is an Escrow Release Transfer Agreement ("ERTA") which was executed on April 2, 2010 between S&M and Kelly Capital. The ERTA incorporates by reference an Escrow Agreement executed the same day. Also, at issue is a related indemnity agreement executed by Malcolm ("Mac") Bailey, founder and Chief Executive Officer of S&M.

---

[2] The counterclaim pleadings filed by S&M are misnomered. In particular, in S&M's Amended Counterclaim, it has referred to itself as a Third-Party Plaintiff and to SEI as a Third-Party Defendant. Neither appellation is correct because S&M is not impleading SEI as a matter of third-party practice.

Rather, S&M brought SEI into the case as a defendant to its Counterclaim by relying on Fed. R. Civ. P. 13(h) and Fed. R. Civ. P. 20. At all times thereafter, SEI acted as if it was a Counterclaim defendant, and it has filed its own Counterclaim which has been amended.

All parties have treated this action as one seeking a declaration respecting the contract rights and obligations of Kelly and SEI, on the one hand, and S&M, on the other. When queried about the procedural anomalies, all counsel agreed that SEI was properly a Counterclaim defendant in the ACC and a Counterclaim plaintiff in its Amended Counterclaim. No party sought any relief as a consequence of the niceties of counterclaim, crossclaim or third-party pleading. The parties tried this case in order to secure a declaration regarding the nature of their respective obligations under a contract, the terms of which are binding on each of them.

The April 2 ERTA gave Kelly Capital rights to make an initial purchase of "escrow releases" and an option to purchase "escrow releases" in the future.[3] FPTO ¶ 45. On April 16, Kelly Capital assigned its rights to purchase the initial escrow releases to SEI. Id. ¶ 47. S&M and SEI executed an ERTA identical to the April 2 ERTA, except that SEI did not obtain an option to purchase future escrow releases. On July 15, Kelly Capital's option having expired, the parties agreed to a reinstatement of, and a second amendment to, the April 2 ERTA. Id. ¶ 48. In the Second Amended ERTA, Kelly Capital assigned its rights to Kelly Escrow, and S&M agreed to give Kelly Escrow additional options for future purchases of escrow releases. Id. ¶¶ 48-49. This opinion will refer to the first ERTA because all of the ERTAs reflect the terms of that ERTA, the only differences between them being that SEI did not have any options for future purchases, and the change in the date by which Kelly Escrow was permitted to exercise its options.

A brief look at the background of S&M's business and the circumstances giving rise to the ERTA will help in understanding the contract dispute here at issue. The facts recited are either stipulated, not in dispute, or, if in dispute, are found,

---

[3] The term "escrow release" relates to interest income earned on the escrow accounts and reversionary rights associated with principal in those accounts and will be defined and discussed further infra.

as recited, because they are proved by a preponderance of the evidence.

**A.   Background; Escrow Accounts; Escrow Releases**

S&M has been a tobacco manufacturer and distributor of cigarettes and other tobacco products since 1994.   FPTO ¶ 5 (Docket No. 123).   It is a privately owned, family run corporation, with its principal place of business in Keysville, Virginia, but it sells tobacco products throughout the Eastern United States.   Id.

In the 1990's, several states initiated class actions against tobacco manufacturers seeking compensation for expenses incurred, or to be incurred, in treating diseases associated with smoking tobacco.   Those actions were settled pursuant to a 1998 Master Settlement Agreement ("MSA").   However, not all tobacco companies were parties to the class actions or the MSA; and, to bring the non-signing manufacturers into the fold and achieve the same result as the MSA, states passed legislation.

As a result of the MSA or the state legislation, tobacco manufacturers in Virginia and 45 other states are required either to have signed the MSA or to contribute annually to an escrow account certain sums for each carton of cigarettes sold. See, e.g., Virginia Code § 3.2-4201.   The deposited funds must remain in escrow for 25 years.   While in escrow, those funds may be used only to pay judgments on, or settlements of, tobacco-

related claims.  Id.  At the end of 25 years, the depositing company is entitled to the deposited funds then remaining in the escrow account, i.e., the portion of the principal that has not been used to pay judgments on, or settlements of, tobacco-related claims.  The deposited funds may be invested, under tightly regulated circumstances, in very restricted investment vehicles that produce interest income.  In essence, the deposited funds earn interest and the depositing company is entitled to that interest, as it is earned.

S&M did not sign the MSA, and thus, as required by state laws, it has established escrow accounts in each state in which it sells cigarettes.  The escrow accounts are governed by an Escrow Agreement between S&M and a national banking association (the "Escrow Agent").  FPTO ¶ 17.  S&M has a separate escrow account for each year in which it has sold cigarettes and thereafter funded the escrow accounts.  Id.

The tobacco companies that establish, and fund, these escrow accounts cannot sell, transfer, distribute, or use the principal funds deposited in the accounts until expiration of the 25-year period.  Id.  However, they can sell or distribute what are called "escrow releases."  An escrow release, inter alia, vests in the purchasing entity: (1) the right to the interest income earned from the funds that have been deposited into the escrow accounts; and (2) the right to receive any

funds, principal or interest, that remain in the escrow account at the end of the 25-year period.  Id.

## B.  Qualified Settlement Funds

Tobacco companies that were signatories to the MSA were able to take tax deductions for their contributions to the escrow accounts because those accounts were designated as Qualified Settlement Funds ("QSF").  However, non-signatories to the MSA were not accorded that benefit.  Thus, from 2000-2007,[4] S&M was not able to take deductions for its deposits to the escrow accounts.  The inability to take tax deductions reduced S&M's profits and also put S&M at a competitive disadvantage with manufacturers which were parties to the MSA even though S&M's products generally sold at lower prices than so-called brand name cigarettes.

In January 2007, however, S&M obtained a private letter ruling from the Internal Revenue Service (IRS) stating that its escrow accounts could be treated as QSFs for tax purposes under Treas. Reg. § 1.468B.  Id. ¶ 22.  Thereafter, deposits made to the QSFs were tax-deductible by S&M.

A QSF is a creature of regulation.  It is defined as a fund that is:  (1) established to resolve claims arising, *inter alia*, from a tort or violation of law; (2) established pursuant to a

---

[4]  S&M became statutorily obligated in 2000 to establish escrow accounts.

court order or approved by a state or federal governmental entity; and (3) segregated from the other assets of the "transferor." Id. ¶ 23. It is a "United States person and is subject to tax on its modified gross income for any taxable year at a rate equal to the maximum rate in effect for that taxable year." Id. ¶ 26 (quoting Treas. Reg. 1.468B-2(a)).

The "income" earned by the escrow accounts is the interest earned on the funds deposited in those accounts. And, the interest is the only source of funding that a QSF can permissibly use to pay its taxes because it produces no other income, and, of course, the principal in the QSF cannot be used for any purpose other than to pay judgments on, or settlements of, tobacco-related claims.

The parties agree that, the interest earned on the deposited principal funds in a QSF is subject to a double layer of taxation. Specifically, the owner of the right to the interest income must pay income tax when that interest is received. And, the QSF also must pay income tax on that interest under Treasury Regulation § 1.468B-1 (the so-called "QSF-level tax").

## C.  Sale of the Escrow Releases

In 2007, S&M began actively trying to sell its "escrow releases." To that end, it engaged in negotiations with a company known as "Fortress" and arrived at a tentative

8

arrangement to sell escrow releases for 34 cents per dollar of principal transferred.[5]  Brian Gallogly and Andrew Sroka, lawyers in the Brown Rudnick firm, represented Fortress during the negotiations with S&M.[6]  Fortress and S&M executed an ERTA, but the transaction did not close because Fortress belatedly realized the import of the above-described "double layer of taxation."  Id.; Ms. Bailey Testimony, Feb. 7, 2012 Tr. 406-407 (Docket No. 141).

In 2009, S&M was still in search of a buyer for its escrow releases, and it hired a broker, Frank Cammarata, to help locate purchasers for the escrow releases.  FPTO ¶ 34.  Mr. Cammarata reached out to Kelly Capital, a private equity firm that acquired and managed asset-based businesses, real estate, debt, and other investments.  FPTO ¶ 1.  Kelly Capital is a member of Kelly Escrow Fund, a California limited liability company that was formed for the purpose of purchasing, managing, assigning, and selling tobacco escrow releases.  Id. ¶ 3.  Kelly Capital was the primary negotiator of the ERTA, acting throughout the transaction for itself and Kelly Escrow.

The persons who handled the negotiations on behalf of Kelly for the purchase of the escrow releases were:  Chairman, CEO,

---

[5]  Pl. Findings of Fact & Conclusions of Law ("Pl. FF & CL") ¶ 32 (Docket No. 149); Ms. Bailey Testimony, Feb. 7, 2012 Tr. 406-407 (Docket No. 141).

[6]  Id. at 408; Pl. FF & CL ¶ 39 (Docket No. 149).

and owner of Kelly Capital, Michael Kelly, President of Kelly

Capital, David Nicholas ("Nick") Spriggs; and Assistant General

Counsel for Kelly Capital, Priya Reddy.  Id. ¶ 2.  Mr. Kelly and

Mr. Spriggs also controlled the actions of, and spoke for, SEI

during the transaction.  Id. ¶ 8.  SEI is a limited purpose

federal savings association and is the trustee of NSI Pension

Plan B.  Id. ¶ 7; see also Mr. Spriggs Testimony, Feb. 7, 2012

Tr. 249 (Docket No. 141).[7]

Mr. Cammarata set up a conference call on January 7, 2010

between Kelly and the leadership at S&M.  FPTO ¶ 38; Ms. Bailey

---

[7]   SEI and Kelly Capital are essentially the same entity for
purposes of this litigation.  Mr. Kelly owns NSI Pension Plan B,
and Mr. Spriggs and Mr. Kelly, as members of NSI's pension
board, have control over SEI's purchases.  They instructed SEI
to purchase 30 million dollars in escrow releases from S&M in
April.  Mr. Spriggs Testimony, Feb. 7, 2012 Tr. 249, 312 (Docket
No. 141).  No person from SEI participated in the negotiations
or the transaction.

> Q: And what was SEI's role, if any, in
> negotiating the terms of the ERTA that they
> signed on April 16?"
> A: None
> Q: Who negotiated it?
> A: I did.
> Q: How is it that SEI signed this document
> that they hadn't negotiated?
> A: I directed them to.

See Mr. Kelly Testimony, Feb. 6, 2012 Tr. 109-110 (Docket No.
141); Ms. Reddy Testimony, Feb. 7, 2012 Tr. 421 (Docket No. 141)
("I actually didn't know the term SEI until right at closing.
As far as I was aware, Michael Kelly spoke for SEI.").

Testimony, Feb. 7, 2012, Tr. 416-17 (Docket No. 141). President of S&M Brands Steven Bailey, General Counsel Everett ("Trey") Gee, and Director of Accounting & Finance Beverly Bailey[8] all participated in the call for S&M. Id. at 416; FPTO ¶ 6. Mr. Bailey, Mr. Gee, and Ms. Bailey spoke for S&M in the discussions with Kelly during the negotiation of the terms of the ERTA and thereafter. Id. ¶ 39. After this initial call, the parties continued negotiations for several months, conducting as many as 30 conference calls in January, February, and March. Ms. Bailey Testimony, Feb. 7, 2012 Tr. 423-24 (Docket No. 141).

Because S&M did not want a recurrence of the Fortress collapse, S&M informed Kelly, early in the negotiations, about the QSF-status of the escrow releases and about the double-layer of taxation. S&M suggested that Kelly research the tax matter. FPTO ¶ 36; Mr. Spriggs Testimony, Feb. 7, 2012 Tr. 261 (Docket No. 141). Mr. Kelly responded to that advice by relating that "he intended to put [the to-be-purchased] escrow [releases] into a pension fund that was associated with a company that Kelly Capital owned [SEI] . . . and he wasn't concerned with two levels of taxation inasmuch as the pension fund avoided the second level of taxation." Mr. Gee's Testimony, Feb. 8, 2012

---

[8]   Ms. Bailey is not a member of the Bailey family.  She merely shares the same name.

Tr. 577 (Docket No. 142).[9]  That approach was abandoned, however, when Kelly learned that a pension fund could not prudently own the quantum of escrow releases that Kelly had decided to buy from S&M.  Id. at 580.  When that circumstance became known to Kelly, the configuration of the transaction changed.  Mr. Kelly then decided that the pension fund would purchase the quantum of releases that it could prudently hold in its portfolio, and Kelly would then purchase the quantum that the pension fund could not buy with a view to immediately reselling, or "flipping" them to third-parties.[10]

Having determined that the pension fund could purchase a limited quantity of the S&M escrow releases, but desirous of purchasing a greater quantity than that, it thus became necessary to find a way that Kelly could avoid the QSF-level tax.  Def. Exhibit 19; Joint Tr. Exhibit 25 at 2; Def. Exhibit 22; Joint Tr. Exhibit 26; Def. Exhibit 24.  Mr. Kelly had settled, by then, on the theory that, because S&M would pay taxes on its income from the sale of its escrow releases and because Kelly would thereafter own all "income" generated by the

---

[9]  The Court finds Mr. Gee's testimony on this point to be credible.  The Court bases its credibility finding on Mr. Gee's demeanor while testifying, the fact that his testimony with respect to the pension fund went unchallenged, and the fact that the contemporaneous documents support his version of events.

[10]  At some point after the sale of the escrow releases, Mr. Kelly again changed course, deciding to resell (or flip) all of the escrow releases, even those held in the pension fund.

escrowed funds, the QSF-status of the funds (and hence the QSF-level taxes) would be eliminated upon the completion of its transaction with S&M.   Joint Tr. Exhibit 26; Def. Exhibit 24. Mr. Kelly retained Brown Rudnick (the same firm which formally had represented Fortress) to research that issue.

The lawyers at Brown Rudnick told Mr. Kelly that his theory likely would not work.   Id. ("[S]ince the ownership of the account is still in the name of S&M Brands, and the QSF is a separate tax entity, the QSF should [continue to] pay taxes on earnings and transfer the remainder to Kelly Capital."); see also FPTO ¶ 43.   Thus, early in the negotiations, Mr. Kelly clearly understood that his theory about eliminating the QSF-level taxes might not be viable.   Because of that concern, Mr. Kelly approached an insurance company contemplating the purchase of insurance "in case the [IRS] came back and wanted to hit [Kelly] with the taxes."   Def. Exhibit 30; Mr. Spriggs Testimony, Feb. 7, 2012 Tr. 264-65 (Docket No. 141).[11]

## D.   The Negotiations and the Exchange of Drafts

Various drafts of the ERTA and discussions during the exchange of drafts reflect that the parties were fully aware of the QSF-level tax issue.   Everett Gee of S&M sent Mr. Kelly the first draft of the ERTA on January 21, 2010.   In that draft,

---

[11]   From the record, it does not appear that Kelly ever purchased insurance.

Section 5.02(a) required the purchaser to "pay all applicable federal and state taxes, if any, required to be paid by the Purchaser with respect to the Assigned Escrow Releases, including the taxes for a Qualified Settlement Fund under the Internal Revenue Code." FPTO ¶ 54. In other words, the first draft of the ERTA clearly required Kelly to pay the QSF-level taxes. The record shows that the purchase price (34 cents per dollar of principal transferred) did not allow room for S&M to pay the QSF-level tax, a fact that Kelly fully understood.

On March 5, 2010, Kelly sent a revised draft to S&M. In that draft, Kelly eliminated the phrase "Qualified Settlement Funds" from Section 5.02(a). Id. ¶ 55. Kelly also added Section 5.01(m), requiring the seller to "pay all applicable federal and state taxes, if any, required to be paid by the Seller and the Qualified Settlement Funds, including any taxes owed with respect to the Assigned Escrow Releases prior to their receipt by the Purchaser." Id. ¶ 57. Section 5.01(m) also provided that S&M would indemnify:

> the Purchaser and its assignees for any loss of Assigned Escrow Releases or Related Escrow Funds proximately caused by the Seller's or the Qualified Settlement Funds' failure to pay such liability and breach of this Section 5.01(m) [and that S&M Brands would] promptly pay all reasonable legal and other directly related expenses incurred by the Purchaser or its Assignees in connection with any such dispute.

14

FPTO ¶ 57.

On March 18, 2010, S&M rejected that text and sent Kelly another draft. In that draft, S&M agreed to pay only the taxes required to be paid on the Qualified Settlement Funds that had "accrued on or prior to the Closing Date." FPTO ¶ 58. It also agreed to indemnify Kelly if S&M failed to pay those pre-closing taxes. Id. Kelly accepted the revision, thereby making S&M liable only for those QSF-level taxes that accrued before closing, but it sent S&M a revised draft in which it added several sentences to the last paragraph of Section 5.01(m):

> . . . In the event that the Internal Revenue Service or any state taxing authority makes any claim that the Seller or the Qualified Settlement Funds owe any federal or state tax liability (including any penalties or fines) with respect to the Assigned Escrow Releases or Related Escrow Funds accrued after the Closing Date, the Seller shall use its best efforts to cooperate with the Purchaser or its Assignee to defend such claim . . . The Seller shall promptly pay all reasonable legal and other directly related expenses incurred by the Purchaser or its Assignees in connection with any such dispute as invoiced by the Purchaser or its Assignee to the Seller.

FPTO ¶ 60.

S&M responded with a revised draft the next day, rejecting Kelly's additions to § 5.01(m). In its revisions, S&M reversed the obligations in the last sentence of the paragraph, requiring "the Purchaser" [not the Seller] to pay "all reasonable legal

and directly related expenses" should the Seller have to defend a claim related to tax liability.   FPTO ¶ 61.   And, S&M also amended Section 5.02(a).   The revised Section provided:   "The Purchaser shall pay all applicable federal and state taxes, if any, required to be paid by the Purchaser with respect to the Assigned Escrow Releases or <u>Related Escrow Funds received by it</u>."   Joint Tr. Exhibit 2 (added language emphasized).

The final ERTA uses the same wording as the March 19 draft in Sections 5.02(a) and 5.01(m).   <u>Id.</u>; FPTO ¶ 61.   Kelly accepted the revisions, acknowledging that it would not be indemnified by S&M on QSF-level tax issues.   Def. Exhibit 121 (Gallogly Tr. 131) (counsel for Brown Rudnick (and one of the drafters of the ERTA) explaining that flipping the indemnity in 5.01(m) was part of the "business deal [between the parties]"); Def. Exhibit 102 (email from Brown Rudnick to Mr. Kelly in which Brown Rudnick acknowledges that Mr. Kelly had been unable to obtain any indemnification from S&M Brands).[12]

---

[12]   Mac Bailey did execute an Indemnity Agreement on April 16, 2012 in which he agreed to indemnify Kelly if S&M breached the ERTA by failing to abide by certain provisions of the Agreement. Joint Tr. Exhibit 6.   He covenanted that, if the ERTA required it, S&M would "pay all applicable federal and state taxes, if any, required to be paid by the Seller and the Qualified Settlement Funds, including any taxes owed with respect to the Assigned Escrow Releases prior to their receipt by the Purchaser."   FPTO ¶ 62; Joint Tr. Exhibit 6.   S&M was not a party to the indemnity agreement.   <u>Id.</u>

The day before the closing, Andrew Sroka of Brown Rudnick again informed Mr. Kelly that his theory, that the QSF-status of the escrow releases would be eliminated upon the closing of the transaction, might well not be accepted by the IRS.   Def. Exhibit 51.   According to Mr. Sroka, "[Kelly] indicated that they had assessed and were comfortable taking on that risk." Id.   Thus, fully informed that it might well not be able to avoid the QSF-level taxes, Kelly went forward with the closing on April 2, 2010.   FPTO ¶ 45.

The final ERTA gave Kelly Capital or its assignees the right to purchase specified escrow releases for 34 cents per dollar of principal.   Id.   It also gave Kelly Capital or its assignees "options" to purchase additional escrow releases in the future if certain timing requirements were satisfied.   Id.

On April 16, 2010, Kelly Capital assigned its immediate rights to purchase escrow releases to SEI, and SEI purchased $30 million of escrow releases for a purchase price of $10 million. On July 15, 2010, Kelly Capital assigned the remainder of its rights to purchase escrow releases to Kelly Escrow, and Kelly Escrow purchased $40 million of escrow releases for a purchase price of $13.6 million.   Id. ¶¶ 47-48.[13]   Kelly and SEI then sought to resell the escrow releases to investors or to

---

[13] S&M also granted Kelly Escrow additional options for future purchases.

"securitize" them.    However, Kelly and SEI learned that, in
order to do so, they had to disclose the risk that the
purchasers would be responsible for the QSF-level tax.    FPTO ¶¶
66-68.

### E.   Post-Closing Conduct

Michael Kelly had never stopped researching the viability
of his theory on the QSF-level tax issue.    In fact, dissatisfied
with Brown Rudnick's advice on the topic, Mr. Kelly retained a
new law firm to also assess the issue.    Def. Exhibit 91 (email
from Mr. Gee to Ms. Reddy, Assistant General Counsel at Kelly,
in which Ms. Reddy expresses that Kelly is unhappy with Brown
Rudnick's services and has hired Wood & Porter).[14]

On August 23, 2010, Mr. Spriggs sent S&M an email
explaining that Kelly was "working with [its] tax attorneys to
get the tax issues nailed down," and listing several questions
related to the QSF-level tax.    The questions related to S&M's
deductions for deposits to escrow funds, the tax form for the
QSFs, the private letter ruling obtained by S&M, the possibility
of avoiding the QSF-level tax, and the effect of the private
letter ruling on the Escrow Agreement.    Joint Tr. Exhibit 38.

Kelly thereafter investigated a number of different ways to
address the QSF-level tax problem in order to move forward with

---

[14] Kelly paid Wood & Porter over $100,000 for its work on the tax-
issue.  Mr. Kelly Testimony, Feb. 6, 2012 Tr. 193 (Docket No.
140).

the securitization.   It even considered arguing that the escrow

funds had never been properly classified as QSFs in the first

instance by attacking the 2007 private letter ruling.    Mr.

Spriggs Testimony, Feb. 7, 2012 Tr. 277-78 (Docket No. 141).

And, it also considered buying escrow releases that were not

subject to QSF-level taxes to "ameliorate" the "negative impact"

of the QSF-level taxes that it was obligated to pay by virtue of

the ERTA.   Def. Exhibit 123 (Spriggs Tr. 183-84).   Mr. Spriggs

sent Mr. Kelly a spreadsheet on September 2, 2010, showing

Kelly's projected profits if Kelly paid the QSF-level taxes.

Def. Exhibit 97.

On September 9, 2010, Brown Rudnick responded to a request

by Mr. Kelly that it again "review the QSF issue."   Patrick Cox

of Brown Rudnick sent Mr. Kelly and Mr. Spriggs the following

email:

> Consistent with our findings earlier this
> year, we continue to believe that the QSF
> needs to report and pay taxes on the entire
> amount of interest earned on its bank
> account.   We could not find any authority
> supporting a different conclusion.
>                      ***
> Consequently, this is why we previously
> suggested getting a tax indemnification in
> the ERTA regarding this point.   I understand
> from Brian [Gallogly] that following our
> advice along these lines you were unable to
> get said indemnification from S&M, as they
> refused to give it.   A compromise on this
> point is reflected in the definition of
> Escrow Releases and provisions of the ERTA,
> such as Section 5.01(m).   We recognize that

> you have indicated that you were willing to
> use your business judgment to take an
> aggressive approach with the IRS to the
> effect that taxes would be paid in advance
> to the IRS by S&M Brands following the close
> of the transaction.

Def. Exhibit 102 (emphasis added).

The same day that this email was sent, Kelly requested a conference call with S&M to discuss QSF-level taxes.   Def. Exhibit 94; Ms. Bailey Testimony, Feb. 8, 2012 Tr. 479-80 (Docket No. 142); Pl. FF & CL ¶ 90 (Docket No. 149).  After that call ended, Mr. Kelly telephoned Mr. Gee and, for the first time, advised that, in his view, S&M was obligated to pay the QSF-level taxes.  Id.; Mr. Gee Testimony, Feb. 8, 2012 Tr. 632-33 (Docket No. 142).[15]  The next day, September 10, S&M sent Kelly a letter explaining that it expected Kelly to live up to its obligations under the ERTA, and stating that, Kelly had "assumed the risk of the QSF-level taxation in the ERTA."  Joint Tr. Exhibit 41.

**F.   The Options to Purchase More Escrow Releases**

Under the Second Amended ERTA, Kelly could deposit $100,000 to extend the time in which it was permitted to exercise its options.  On September 13, Kelly sent S&M a letter and $100,000 deposit requesting an extension of the time to exercise its

---

[15]   The Court finds Mr. Gee's testimony to be credible on this point.   S&M's September 10 letter to Kelly corroborates Mr. Gee's testimony.  Joint Tr. Exhibit 41.

20

options to purchase additional escrow releases.   FPTO ¶ 70.   On September 28, 2010 S&M informed Kelly that it would not extend the options period unless Kelly first provided written assurance that it would perform under the ERTA by paying the QSF-level taxes.   Id. ¶ 72.   S&M then attempted unsuccessfully to return Kelly Escrow's $100,000 deposit.   Id.

Kelly responded to S&M's letter and subsequent refusal to extend Kelly's options to purchase additional escrow releases by filing its complaint in this action on October 20, 2010. Discovery ensued.   Cross-motions for summary judgment were denied.   The Court held a Final Pretrial Conference in this matter on January 31, 2012, and a three-day bench trial commenced on February 6, 2012.   At the close of the plaintiffs' evidence, S&M moved for JUDGMENT ON PARTIAL FINDINGS (Docket No. 137) on which decision was reserved.   The parties filed Post-Trial Findings of Fact and Conclusions of Law and presented closing arguments on April 18, 2012.   The matter is now ripe for decision.

### DISCUSSION

**A.   Contract Provisions**

The contract provides that New York law applies to resolve this contract dispute.   ERTA, Joint Tr. Exhibit 2 § 8.02.   Under New York law, the construction of contracts is an issue of law

for the court to decide, and judgment is appropriate where the Court finds the terms of the contract to be unambiguous. Int'l Multifoods Corp. v. Commercial Union Ins. Co., 309 F.3d 76, 83 (2d Cir. 2002); Seiden Assocs., Inc. v. ANC Holdings, Inc., 959 F.2d 425, 429 (2d Cir. 1992).

An ambiguity exists where the contract terms "suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context to the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." Int'l Multifoods Corp., 309 F.3d at 83 (citations and quotations omitted).[16]  In such cases, the court cannot consider parole evidence and must enforce the contract according to its plain meaning. Namad v. Salomon, 74 N.Y.2d 751, 753 (1989); see also W.W.W. Assoc. v. Giancontieri, 77 N.Y. 2d 157 (1990); Stroll v. Epstein, 818 F. Supp. 640, 645-46 (S.D.N.Y. 1993).

Both parties maintain that the contract provisions unambiguously support their respective positions. However, when denying the parties' cross motions for summary judgment, the Court found that there was a "genuine issue of material fact . .

---

[16]   Documents "incorporated by reference" are considered in determining whether a contract is ambiguous because those documents "become an intrinsic part of the contract." Crumpton v. Bridgeport Educ. Ass'n, 993 F.2d 1023, 1028 (2d Cir. 1993).

. with respect to the meaning of the underlying contract in the case." Sept. 23, 2011 Order (Docket No. 94). In so doing, the Court found that the contract was ambiguous, and the Court remains of that view.

The parties base their respective positions on several relevant definitions and provisions of the ERTA. The definitions include:

> **Escrow Release(s):** all right, title and interest in and to and all rights under the Escrow Agreement and the Tobacco Escrow Statutes with respect to (i) release of Escrowed Funds on or after 25 years after the original deposit of each of such Escrowed Funds; (ii) interest or other appreciation earned on such Escrowed Funds . . . [and] the right to give instructions to the Escrow Agent with respect to the investment of the Escrowed Funds . . .

> **Qualified Settlement Fund:** shall have the meaning set forth in the applicable Tobacco Escrow Statutes.

> **Qualified Settlement Funds:** means the Qualified Escrow Funds (comprised of the Escrowed Funds (including the Related Escrow Funds)) each as classified for tax reporting purposes as a qualified settlement fund by the Internal Revenue Service pursuant to a Private Letter Ruling dated January 11, 2007.

The contract provisions of the ERTA on which the parties rely include:

> **2.01(c):** As of the Closing Date . . . the Purchaser shall become the legal and equitable owner of the Assigned Escrow Releases, and shall be entitled to all of

23

the rights, privileges, duties and remedies applicable to said ownership.

**3.03:** Concurrently herewith and as a condition for closing the transaction, the parties shall execute and deliver the Indemnity Agreement and Acknowledgement Agreement.

**5.01(m):** The Seller shall pay all applicable federal and state taxes, if any, required to be paid by the Seller and the Qualified Settlement Funds accrued on or prior to the Closing Date with respect to the Escrowed Funds . . . The Seller shall use its best efforts to cause the Escrow Agent to annually deliver to the Purchaser or its Assignee a Form 1099-INT with respect to the Assigned Escrow Releases. In the event that the Internal Revenue Service or any state taxing authority makes any claim that the Seller or the Qualified Settlement Funds owe any federal or state tax liability (including any penalties or fines) with respect to the Assigned Escrow Releases or Related Escrow Funds accrued after the Closing Date, the Seller shall use its best efforts to cooperate with the Purchaser or its Assignee to defend such claim, subject to Section 5.01(e). For such disputes, the Purchaser or its Assignee shall promptly pay all reasonable legal and directly related expenses incurred by the Seller to the Purchaser or its Assignee.

**5.02(a):** The Purchaser shall pay all applicable federal and state taxes, if any, required to be paid by the Purchaser with respect to the Assigned Escrow Releases or Related Escrow Funds received by it. The Purchaser shall pay all fees and expenses of the Escrow Agent related to the maintenance of the Related Escrowed Funds.

**8.12:** The schedules, annexes and exhibits attached hereto . . . shall constitute a part of this Agreement.

24

The Escrow Agreement is attached to the Agreement as Annex B and is incorporated into the ERTA by § 8.12. Relevant provisions of the Escrow Agreement include:

> **Section 2(e):** . . . Whenever any interest or other funds are payable under this Agreement to the Company, such payment shall be subject to the payment of the Escrow Agent's fees, costs and expenses as provided in Section 9.

> **Section 9:** The Company shall pay the Escrow Agent its reasonable fees and expenses . . . [f]ees, costs and expenses may be paid from interest earned on funds held in or earned on the Account, but the principal in all Beneficiary States' Accounts and sub-accounts shall not be charged . . .

Joint Tr. Exhibit 2.

Nowhere in any of these provisions does either party agree expressly to pay the QSF-level taxes. The purchaser agrees to take on the "duties" of ownership of the escrow releases, but no section specifically outlines those duties. The purchaser is also given the power to "invest" the interest from the releases and thus control the amount of tax liability. Yet, there is no specification in the contract that, because the purchaser is given that power, the purchaser is to pay the QSF-level tax.

In § 5.02(a), the purchaser agrees to pay all federal and state taxes required to be paid by it, but that section does not specify that one of the taxes required to be paid is the QSF-level tax. Section 5.01(m) is perhaps the most unclear of all.

S&M agrees to pay the QSF-level tax before closing and Kelly agrees to indemnify S&M if the IRS pursues S&M for post-closing taxes.[17]   S&M then agrees to cooperate with Kelly should the IRS pursue Kelly for post-closing QSF-level taxes.

The Escrow Agreement does little to clarify the provisions of the ERTA respecting liability for the QSF-level taxes. Sections Two and Nine simply say that the Escrow Agent must be paid "fees, costs, and expenses," and that the interest from the escrow releases can be used to pay those fees, costs, and expenses.   Those Sections do not provide that the QSF-level tax is a "fee," "cost," or "expense."   Nor do they mandate payment of "fees, costs, and expenses" from the interest earned by the funds.   Instead, they simply prohibit the use of the principal for any such payment.   By purposefully omitting references to the QSF-level taxes in order to allow Mr. Kelly to press his theory with the IRS, the parties created an ambiguous contract.

**B.   Indemnity Agreement Executed By Mr. Mac Bailey**

Kelly argues that the Indemnity Agreement executed contemporaneously with the ERTA by Mac Bailey, S&M's founder,

---

[17]   The extent of this indemnification is another ambiguity in the contract.   In § 5.01(m), Kelly agreed to pay "legal" and "other directly related expenses."   S&M argues that the term "other directly related expenses" includes payment of the QSF-level taxes.   Kelly argues that the term does not include payment of the taxes.   Because the parties deliberately omitted language related to the QSF-level tax, it is not possible to come to a certain conclusion on the matter based on the contract language alone.

confirms "that liability for the QSF's taxes remained with the QSF and was not transferred to the Purchasers [Kelly and SEI]." Pl. FF & CL ¶¶ 126-29.[18]   The part of the Indemnity Agreement on which Kelly relies is paragraph 24, one of 24 warranties made by Mac Bailey to induce Kelly to enter the ERTA.   In that paragraph, Mr. Bailey warrants that S&M:

> (24) Has and will pay all applicable federal and state taxes, if any, required to be paid by the Seller [S&M] and the Qualified Settlement Funds, including any taxes owed with respect to the Assigned Escrow Releases prior to their receipt by the Purchaser.

Joint Tr. Exhibit 7.   Although the document is entitled "Indemnity Agreement," it does not contain the usual language of indemnification and, whatever its import may be, Mr. Bailey's obligations under it are limited in amount.

Whatever else may be said of paragraph 24, it does not unambiguously require S&M (which is not a party to the agreement) to pay the QSF-level taxes.   Indeed, the language in paragraph 24 is subject to several reasonable interpretations. Possibly, it means that S&M will pay all taxes prior to transferring the rights, privileges, duties, and remedies of the ownership of the escrow releases over to Kelly.   Under this

---

[18]   Kelly does not argue that the Indemnity Agreement is part of the ERTA.   Nor, under New York law, could it succeed on such an argument, if made.

interpretation, both ¶ 24 and § 5.01(m) would provide for the payment of only pre-closing taxes by S&M Brands. Or, alternatively, perhaps the language means that S&M Brands agreed to pay all taxes, including the QSF-level taxes, prior to transferring the interest from the escrow releases to Kelly. Or, the language might be interpreted to mean that the parties agreed that the QSF-level tax would be automatically deducted from each interest payment. In that case, Kelly would receive only the interest net of the QSF-level tax. The wording in ¶ 24 does nothing to shed light on the parties' agreement respecting payment of the QSF-level taxes. And, in any event, the Indemnity Agreement limits Mr. Bailey's indemnity obligations in providing that, "[all of its] representations, warranties and covenants notwithstanding," Bailey shall be liable only for losses of "Related Escrowed Funds" caused by S&M's breach of the ERTA. Thus, because the Indemnity Agreement was only a promise that, if S&M did not abide by the terms of the ERTA, Kelly could seek a measure of indemnity from Mr. Bailey, the wording of the ERTA would seem to control the meaning of the language in the Indemnity Agreement, not vice versa.

In sum, the text of the Indemnity Agreement does not clarify the ambiguity in the ERTA respecting the responsibility for paying the QSF-level taxes.

## C.    Parole Evidence

Where ambiguity is found, parole evidence is admissible, and "'the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract.'" Int'l Multifoods Corp. v. Commercial Union Ins. Co., 309 F.3d 76, 83 (2d Cir. 2002); (quoting Morgan Stanley Group Inc. v. New Eng. Ins. Co., 225 F.3d 270, 275 (2d Cir. 2000); Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, 136 F.3d 82, 86 (2d Cir. 1998)). Extrinsic evidence includes the negotiations, the course of dealing between the parties, the customs in the trade, and evidence of other similar transactions. See, e.g., Restatement 2d of Contracts § 202. Here, the extrinsic evidence demonstrates that the ERTA placed the obligation to pay the QSF-level taxes on Kelly.

First, the course of the negotiations and the dealing between the parties demonstrates that Kelly assumed the risk of the QSF-level tax obligation. From the very first conference between the parties, Kelly was made aware of the QSF double level of taxation issue and was told to conduct its own research.[19] Mr. Kelly early on arrived at the theory that the

---

[19]    The record shows that the double-level of taxation issue caused the S&M-Fortress transaction to unravel just before closing and that S&M did not want that to happen again. Hence, S&M made sure to raise the issue early and clearly in its

QSF-status of the funds would be eliminated at closing, when S&M received the proceeds from the sale and Kelly acquired the escrow releases.[20] He worked diligently, and hired experienced counsel at Brown Rudnick to work diligently, to try to establish that his theory about eliminating the QSF-level taxes was viable. Def. Exhibit 19; Joint Tr. Exhibit 25 at 2; Def. Exhibit 22; Joint Tr. Exhibit 26; Def. Exhibit 24.

Both before and after the closing, Mr. Kelly actively pursued his theory, and continued to believe in its merit, even though lawyers at Brown Rudnick told him that his approach was "aggressive" and that the QSF-status of the purchased escrow releases likely would not be eliminated by the transaction. See, e.g., Def. Exhibit 24; FPTO ¶ 43. The record shows that Kelly understood the risk it was taking; the company even sought insurance in case Mr. Kelly's theory was incorrect. Def.

discussions with Kelly. This was quite important to S&M because the price it put on the purchase of the escrow releases ($.34 per $1.00) did not allow room for S&M to pay any tax on the transferred assets.

[20] The parties dispute who first came up with the theory that the sale of the escrow releases would result in the elimination of their QSF-status. The consistent testimony of Ms. Bailey and Mr. Gee on this point, which the Court accepts as credible, is that the concept was originated by Mr. Kelly. Beverly Bailey Testimony, Feb. 8, 2012 Tr. 464-65; Everett Gee Testimony, Feb. 8, 2012 Tr. 584. The credibility of Mr. Kelly's testimony is undermined by his demeanor while testifying, the documents in Kelly's files, the memoranda and email from Brown Rudnick, and the nature and extent of Mr. Kelly's efforts to try to find support for his theory.

Exhibit 30; Mr. Spriggs Testimony, Feb. 7, 2012 Tr. 264-65
(Docket No. 141).  That further supports the view that Mr. Kelly
understood that, under the ERTA, Kelly was responsible for the
QSF-level taxes, if his theory would not fly.

Second, the drafting history confirms that it was Kelly
that had to pay the QSF-level tax if Mr. Kelly's theory was not
viable.  Multiple drafts of the ERTA were exchanged, with each
party trying to convince the other to accept indemnity language
and language allocating to the other the risk of the QSF-level
tax burden.  Throughout the process, S&M stood fast, refusing to
accept that burden.  And, although the drafters removed most of
the language that specified that Kelly was to pay the QSF-level
taxes in an effort to afford Mr. Kelly the opportunity to press
his theory with the IRS, S&M won several important concessions
that support its position.  For example, in § 2.01(c), Kelly
agreed to take on all the "duties" applicable to ownership of
the escrow releases.  One of the duties of ownership is to pay
the QSF-level taxes that are due and must be paid.[21]  In §
5.01(m), S&M agreed to deliver appropriate tax forms to Kelly
and to cooperate should the IRS pursue Kelly for the QSF-level
taxes.  Kelly, in turn, agreed to pay S&M for any legal or other
directly related expenses incurred by S&M as a result of its

_____

[21]  Kelly also had the "right" to invest the funds in any way it
saw fit.  Joint Tr. Exhibit 2, § 1.01.

cooperation. The Brown Rudnick lawyers who were involved in drafting the ERTA made clear to Kelly that § 5.01(m) was the result of a "business deal" between the parties and that, contrary to Brown Rudnick's advice, Kelly did not receive indemnification from S&M for the QSF-level taxes. Def. Exhibit 121 (Gallogly Tr. 131); Def. Exhibit 102. And, an interpretation of § 5.01(m) consistent with this concession makes good sense.

If Kelly did not believe that it, not S&M, was responsible for the QSF-level taxes, why would it agree to indemnify S&M for its "cooperation" in opposing efforts by the IRS to collect those taxes from Kelly?

Also, the language respecting delivery of the tax forms, the assumption that the IRS would pursue Kelly for the taxes, and the agreement by Kelly to pay S&M for expenses that S&M incurred in Kelly's disputes with the IRS, all are consistent with S&M's contention that Kelly assumed the risk of QSF-tax liability. And, S&M, as shown by its post-closing conduct, demonstrated a willingness throughout the parties' interactions to send information, openly discuss, and otherwise cooperate with Kelly on QSF-tax issues. Therefore, it is not surprising that it agreed to do so in the ERTA.

Third, in § 5.02(a), Kelly agreed to "pay all applicable federal and state taxes, if any, required to be paid by the

Purchaser with respect to the Assigned Escrow Releases or Related Escrow Funds received by it." The section does not, as Kelly argues, exclude the obligation to pay QSF-level taxes, which clearly are required to be paid from the escrow releases (the "interest"). To the contrary, when the negotiating history, the previous drafts, and Mr. Kelly's theory are considered, it is evident that, under § 5.02(a), Kelly is obligated to pay the QSF-level taxes. Indeed, the section explicitly gave Kelly this obligation before language changes were made to give Kelly flexibility to pursue Mr. Kelly's theory with the IRS. Kelly knowingly accepted the risk that Mr. Kelly's theory might not be a viable one, and it knew that, if Mr. Kelly's theory was incorrect, Kelly, not S&M, would be responsible to pay the QSF-level taxes.

Fourth, Kelly's post-closing conduct further underscores its understanding that it had assumed the risk of QSF-level tax liability. Kelly continued to research the QSF-level tax issue in earnest after the closing, hiring another law firm, and spending more than a hundred thousand dollars on attorney's fees in that effort. S&M, on the other hand, conducted no research on the matter. Kelly asked S&M questions about how filing a tax-return for the QSF would work and about the mechanics of the private letter ruling. Joint Tr. Exhibit 38.

Mr. Spriggs analyzed Kelly's profit yield if it had to pay the QSF-level taxes, Def. Exhibit 97, and Kelly asked S&M to help it find escrow releases that were not QSFs in order to "ameliorate" the "negative impact" of the QSF-level taxes. Def. Exhibit 123 (Spriggs Tr. 183-84). Kelly also considered attacking the validity of the private letter ruling and the creation of the QSF in the first instance. Mr. Spriggs Testimony, Feb. 7, 2012 Tr. 277-78 (Docket No. 141). If Kelly was of the view that S&M had contractually assumed the risk of paying the QSF-level taxes, it would have been quite irrational for Kelly to have spent so much money and time researching these issues.

In trying to securitize the escrow releases, Kelly came to the realization that it would have to disclose the QSF-level tax burden, Mr. Kelly's theory, and the flaws inherent in that theory to potential investors. If Kelly had believed that S&M was obligated by the ERTA to pay the QSF-level taxes, it simply could have so said in its disclosure to investors. But, Kelly knew that it could not make such a statement because it knew well that the ERTA did not impose that obligation on S&M. To the contrary, as is shown by the text of the ERTA and the drafting history, Kelly knew that S&M had refused to accept that obligation, but had agreed to contract language that Mr. Kelly believed would allow Kelly to pursue his theory with the IRS.

September 9 was the first time that Kelly suggested to S&M that it might be liable for the taxes. S&M immediately responded to Kelly's suggestion with a written letter outlining the dealings between the parties and stating quite clearly that it had not assumed the risk of paying the taxes. Joint Tr. Exhibit 41. S&M's behavior was consistent with that of a party which was fully aware that it had not assumed the risk of the QSF-level taxes. After the closing, S&M had nothing left to research because it had no further potential obligations. It was unconcerned about whether the funds were "out from the umbrella" of the QSF because the classification of the funds would have no impact on it. When Kelly suddenly suggested that S&M should pay the taxes, S&M acted swiftly to ensure that there could be no misunderstanding. And, S&M refused to honor Kelly's request to extend its options to purchase additional escrow releases under the ERTA. S&M explained that it would not extend the options unless it received written assurance that Kelly would pay the QSF-level taxes. FPTO ¶ 70-72. That conduct is fully consistent with S&M's understanding that Kelly, not S&M, was responsible for any QSF-level taxes.

Kelly's post-closing conduct, on the other hand, was consistent with its understanding that it had assumed responsibility to pay the QSF-level taxes.

## D.   Commercial Rationality

Quite apart from the parties' conduct and the negotiation history, Kelly and SEI's position here runs afoul of the fundamental proposition that a contract "should not be interpreted to produce a result that is absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties." Lipper Holdings, LLC v. Trident Holdings, LLC, 766 N.Y.S.2d 561, 561 (App. Div. 2003) (citations omitted); Superb Gen. Contracting Co. v. City of New York, 833 N.Y.S.2d 64, 64 (App. Div. 2007). If S&M was to be responsible for the QSF-level taxes, its transaction with Kelly would have made no commercial sense. Not only would S&M make no profit, it would actually lose over a million dollars on the transaction. As Ms. Bailey explained, the purchase price paid by Kelly and SEI for the QSFs is less than the QSF-level tax liability. Beverly Bailey Testimony, Feb. 8, 2012 Tr. 491-98. On that point, she testified that, after taxes, S&M received $14 million for the escrow releases sold to Kelly and SEI. Id. at 491. And, she estimated that the QSF-tax liability would be over $15 million dollars. Id. at 491-98. According to Ms. Bailey, if S&M owed the QSF-level taxes, its loss would be so great as to drive the company out of business. Id. 500.[22] It makes no commercial

---

[22]   Kelly and SEI did not dispute this analysis, and the Court finds Ms. Bailey's testimony credible. Her demeanor, tone, and

sense for a party to contract in such a way as to effect its own ruin.

In contrast, even if Kelly and SEI cannot convince the IRS that they do not owe the QSF-level taxes, they will still earn a healthy return on their investment, a return of approximately 7 to 11 percent. See, e.g. Def. Exhibit 97. Using interest rates based on historical averages, Ms. Bailey testified that Kelly and SEI can expect to earn a profit of $25.2 million over the next 20 years. Beverly Bailey Testimony, Feb. 8, 2012 Tr. 498-500. Using these interest rates, if Kelly and SEI pay QSF-level taxes from their profits, they will still pocket $8.4 million dollars. Ms. Bailey's testimony is consistent with that of Mr. Spriggs who testified that, if Kelly and SEI have to pay the QSF-level taxes, their return on investment would be 7-8 percent. Mr. Spriggs Testimony, Feb. 7, 2012 Tr. 233-34. But see Joint Tr. Exhibit 35 (estimating 10-11 percent return on sale of 40 million dollars of escrow releases); Mr. Spriggs Testimony, Feb. 7, 2012 Tr. 285-286 (acknowledging 10-11 percent figure). As Mr. Spriggs explained, Kelly had hoped for a much higher return on investment. However, as found above, Kelly took the known risk that its return on the investment would be less than it wanted when it proceeded with the purchase of the

_____

responses to both the Court's and opposing counsel's questions demonstrated her veracity. The testimony of other witnesses supports her testimony as well.

escrow releases knowing that there was a substantial risk that it would have to pay the QSF-level taxes.

Further, the 7-11 percent return on investment estimate does not even take into account the profit to which Kelly and SEI are entitled at the end of the escrow period.  Under the ERTA, Kelly and SEI purchased not only the escrow releases, but also the reversionary rights in the principal of the escrow accounts.  At the end of the 25-year period of escrow, Kelly and SEI will receive all funds that remain in those accounts.

Kelly and SEI's position in this case asks the Court to conclude that a company, that has been in business some 17 years, would enter into a contract based on a novel theory on which it has done no research, agreeing to assume a risk that has the potential to eradicate the company.  That takes logic, common sense, and commercial reason a bridge too far.[23]

**E.   Summary:   The Interpretation of the ERTA**

Considering the terms of the ERTA in perspective of the parole evidence, the preponderance of the evidence establishes that the ERTA imposes on Kelly the obligation to pay the QSF-level taxes.  Kelly understood that, if Mr. Kelly's theory was not viable, it would be obligated to pay QSF-level taxes.

---

[23]  Indeed, S&M's refusal to assume liability for QSF-level taxes in its contract with Fortress for the same purchase price ultimately led to the dissolution of negotiations right before closing.

In fact, Kelly was advised that Mr. Kelly's theory was not likely to meet with IRS approval, and Mr. Kelly told Brown Rudnick that Kelly would assume that risk. Sections 2.01 and 5.01(g) of the ERTA allocate all the duties and rights of ownership for the escrow releases to Kelly and allow Kelly to invest the interest from the funds as it sees fit. One of Kelly's rights and duties was to pay the QSF-level taxes if Mr. Kelly's theory turned out not to be viable.

And, the parties understood that the purpose of § 5.01(m) was intended to protect S&M from QSF-level tax liability. The Brown Rudnick lawyers drafting that section explained that the language was purposefully designed to indemnify S&M rather than Kelly. Finally, the "including Qualified Settlement Funds" language in § 5.02(a) was replaced, not to eliminate Kelly's liability for QSF-level taxes, but rather to allow Kelly to continue to pursue Mr. Kelly's theory that neither party would be responsible for the taxes after closing.

Under § 5.02(a), Kelly is responsible for "all applicable federal and state taxes, if any, required to be paid by the purchaser with respect to the Assigned Escrow Releases or Related Escrow Funds received by it." The drafting history, the negotiations, the parties' conduct, and commercial reason all make clear that QSF-level taxes were "required to be paid by the purchaser." Ambiguity was introduced into the contract so that

the contract language would not undercut Kelly's effort to defend Mr. Kelly's risky theory to the IRS. When Kelly finally accepted that the theory would not work and that Kelly could not flip (by securitization or otherwise) the escrow releases and that it would not make as large an ROI as it hoped, Kelly devised a scheme to shift the QSF-level taxes to S&M.

That effort is predicated almost entirely on Mr. Kelly's testimony which the Court finds simply not worthy of belief based on his testimonial demeanor, the drafting history, the contemporaneous documents from Brown Rudnick, and the contrary testimony of Mr. Gee, Mr. Mac Bailey, Mr. Steven Bailey and Ms. Beverly Bailey whom the Court finds to be credible in all ways. And, of course, commercial reason augurs in favor of S&M's position as well.

**F.   Breach of the ERTA Provisions Respecting QSF-Level Taxes on the Options Provision**

### (1)   The Breach

On September 13, 2010, Kelly sent S&M a check for $100,000 seeking an extension of its options pending resolution of the dispute over the liability for the QSF-level taxes. S&M responded that it would not grant the extension unless Kelly provided written assurance that Kelly would perform its obligations to pay the QSF-level taxes. S&M sought, unsuccessfully, to return the $100,000.

S&M argues that Kelly's refusal to pay the QSF-level taxes constituted a material anticipatory breach which operated to excuse S&M from further performance of its obligations and entitled S&M to reject Kelly's attempt to extend its options to purchase additional escrow releases. S&M claims that it would not have entered the contract had Kelly not represented that it would pay the QSF-level taxes. And, S&M says that, because Kelly and SEI failed to pay the QSF-level taxes in April 2012, when the taxes were due, the material anticipatory breach has now matured into actual breach. Def. FF & CL ¶ 110. Kelly contends that it is S&M who breached the ERTA, by rejecting Kelly's attempt to extend its options. Pl. FF & CL ¶¶ 152-156.

Under New York law, a party to a contract commits an anticipatory breach of the contract, when it "manifest[s] intent not to perform." Aetna Cas. And Sur. Co. v. Aniero Concrete Co., Inc., 404 F.3d 566, 587 (2d Cir. 2005). A party's "insistence upon terms not contained in a contract constitutes an anticipatory repudiation thereof." REA Express, Inc. v. Interway Corp., 538 F.2d 953, 955 (2d Cir. 1976). A "material breach" is a breach that "defeats the object of the parties in making the contract and deprives the injured party of the benefit that is justifiably expected." ESPN, Inc. v. Office of the Comm'r of Baseball, 76 F. Supp.2d 416, 421 (S.D.N.Y. 1999). The test for materiality is, whether the alleged breach is "of

41

such nature and such importance that the contract would not have been made without it." Helprin v. Harcourt, Inc., 277 F. Supp. 2d 327, 339 (S.D.N.Y. 2003). Once a material breach has been committed, "the non-breaching party has the right to discontinue performance of the contract." Wells Fargo Fin. Inc. v. Fernandez, 2000 U.S. Dist. LEXIS 17002, at *4 (S.D.N.Y. Nov. 22, 2000).

For the reasons set forth above, Kelly, not S&M, was liable for the QSF-level taxes. By telling S&M that it would not pay the QSF-level taxes, Kelly committed an anticipatory breach. Without doubt, the payment of the QSF-level taxes was "material" to the contract. Neither party disputes its materiality. In fact, both take the view that the obligation is material. If S&M is forced to pay the taxes, the contract will be a detriment to the company, potentially forcing it out of business. Under the circumstances, S&M had the right to discontinue its performance under the ERTA.

If it had agreed to allow Kelly to extend its options to purchase additional escrow releases, S&M would only have been digging its own grave. After discovering that another party had decided not to honor its contractual obligation to pay $15 million dollars in taxes, no rational party would agree to engage in another similar transaction with that same party. Moreover, because, under the ERTA, Kelly and SEI are obligated

to pay the QSF-level taxes, the failure to pay them, when they were due, is a material breach of the ERTA.

**(2)  The Consequence of the Breach**

Here, S&M claims that this breach caused it to incur damages in the form of attorney's fees to defend this action. No other damages were claimed.

A wrongful repudiation of a contract by one party entitles the non-repudiating party to immediately claim damages for total breach. American List Corp. v. U.S. News & World Report, Inc., 549 N.E.2d 1161, 1164 (1977) (citing Long Is. R.R. Co. v. Northville Indus. Corp., 41 N.Y.2d 455, 463 (1977)).  This is true even where the plaintiff has not completed its performance of the contract, so long as the plaintiff was "ready, willing, and able" to tender performance prior to the defendant's breach. See generally RSB Bedford Assocs., LLC v. Ricky's Williamsburg, Inc., 91 A.D.3d 16 (App. Div. 2011) (awarding attorney's fees where defendant committed an anticipatory breach even though plaintiff did not complete its performance of the contract due to the breach); Pesa v. Yoma Dev. Group, Inc., 18 N.Y.3d 527, 531-32 (2012) (unpublished) (concluding that a plaintiff who was "ready, willing, and able" to complete its contractual obligations prior to the defendant's anticipatory breach could recover damages).

Both parties request attorney's fees. First Amended Complaint at 18 (Docket No. 49); Answer to Complaint at 10 (Docket No. 52); Amended Counterclaim at 17 (Docket No. 53). However, Kelly's proposed post-trial findings of fact and conclusions of law do not discuss entitlement to attorney's fees at all. And, S&M's proposed findings of fact and conclusions of law do so only in the most minimal way.

S&M recites at paragraph 110 (of its Proposed Post-Trial Findings of Fact and Conclusions of Law) that the "material and anticipatory breach of the contracts has now matured into an actual breach, entitling S&M Brands to the release specified below." In paragraph 112, S&M relies on § 7.02 of the ERTAs, the purchaser's indemnity entitlement section, as authority for recovery of attorney's fees. Section 7.02, of course, governs S&M's remedies for breach of contract and it provides that, in the event the purchaser breaches the ERTA, "the Seller's sole remedy shall be a claim against the Purchaser for money damages for actual losses, claims, damages or liabilities incurred."

Notably absent from that provision is a requirement that the purchaser pay attorney's fees for litigation associated with the breach. S&M has cited no authority in which an indemnity provision for "money damages for actual losses, claims, damages or liabilities incurred" has been construed to mean or to provide for the payment of attorney's fees in the event of a

breach of the agreement. Nor has the Court found such authority.

"The law is well settled that absent a statutory provision or an agreement between the parties pursuant to which attorney's fees are to be recovered from the losing party, each party must shoulder its own litigation expenses." Breed v. Hulko, 139 A.D.2d 71, 85 (App. Div. 1988) (citing A.G. Ship Maint. Corp. v. Lezak, 69 N.Y.2d 1, 5 (1986); Mighty Midgets v. Centennial Ins. Co., 47 N.Y.2d 12, 21-22 (1979); City of Buffalo v. Clement Co., 28 N.Y.2d 241, 262-63 (1971)). Here, the parties had no agreement that, in the event of a breach, the breaching party would pay the attorney's fees for the prevailing party in an ensuing breach of contract case. Section 7.02 makes no mention at all of attorney's fees. In essence, S&M invites the Court to rework the ERTA to provide a remedy that the ERTA does not provide. The invitation is declined.

## CONCLUSION

For the foregoing reasons, Count One of the FAC will be resolved by denying the requested declarations in Count One, paragraph 48, of the FAC. And, for the foregoing reasons, Count Two (for breach of contract, specific performance and injunctive relief) of the FAC will be resolved by entering judgment in favor of S&M.

For the foregoing reasons, Count I of the ACC is resolved by declaring that Kelly Capital LLC, Kelly Escrow Fund V LLC, and SEI Private Trust Company, as Trustee for the SEI Private Trust, are obligated to pay, or allow to be paid, all federal and state income taxes on earnings on the Qualified Settlement Funds which they purchased pursuant to the Escrow Release Transfer Agreements to which they respectively are parties with S&M Brands, Inc. and by declaring that S&M Brands, Inc. has no obligation to pay such taxes.

Count II of the ACC will be resolved by declaring that Kelly Capital LLC, Kelly Escrow Fund V, LLC and SEI Private Trust Company, as Trustee for the SEI Private Trust, respectively, have committed material anticipatory breaches of the Escrow Release Transfer Agreement to which they are party with S&M Brands, Inc. by unequivocally stating that they will neither pay, nor allow to be paid, the federal or state Qualified Settlement Fund taxes which, for the reasons stated herein, they, respectively, are obligated to pay; and by declaring that, by virtue of the foregoing material anticipatory breach of the Escrow Release Transfer Agreement, S&M Brands, Inc. is released from all further obligations under the Escrow Release Transfer Agreement, including, without limitation, any obligation to transfer additional escrow releases pursuant to the option provision of the Escrow Release Transfer Agreement.

Count I of SEI's Amended Counterclaim will be resolved by denying the declarations and relief requested therein.

Judgment will be entered in accord with the foregoing declarations and a Judgment Order reflecting said declarations, granting the declaratory relief requested by S&M Brands, Inc. in its Counterclaim, and dismissing the FAC and SEI's Amended Counterclaim with prejudice, will be issued herewith.

It is so ORDERED.

                    /s/        *REP*
                    Robert E. Payne
                    Senior United States District Judge

Richmond, Virginia
Date: May 31, 2012

47